Nina SALTER, Plaintiff,

v.

**WASHINGTON TOWNSHIP HEALTH CARE DISTRICT, Defendant.**

No. C–00–2959 VRW.

United States District Court, N.D. California.

March 28, 2003.

of these proceedings, and that he voluntarily surrendered to custody promptly upon revocation of the bail order.

Jaynelle K. Bell, Esq., Bell & Associates, Oakland, CA, for Plaintiff.

Mark H. Van Brussel, Esq., Seyfarth Shaw, Sacramento, CA, for Defendant.

## ORDER

WALKER, District Judge.

Defendant Washington Township Health Care District moves for summary judgment on plaintiff Nina Salter's employment discrimination claims, brought under Title VII of the Civil Rights Act of 1964, 42 USC § 2000e et seq, and California's Fair Employment and Housing Act (FEHA), Cal Govt Code § 12940 et seq. See Doc # 58. Salter opposes this motion. See Doc # 66. For the reasons set forth below, the court GRANTS defendant's motion for summary judgment on all claims (Doc # 58).

## I

The following factual background comes from the parties' submissions and is undisputed unless otherwise noted. Salter began working as a unit clerk for Washington Township Hospital in August 1998. Salter Depo (Doc # 62, Exh A) at 117:16–19. During the relevant time period, Salter worked as head clerk. *Id.* Her duties included answering the telephone, keeping the patient log up to date, assisting the physicians and other clerical duties. *Id.* Salter alleges that throughout her employment, she was subjected to a hostile work environment. At her deposition, Salter described "an incident" in the emergency room (ER) when an emergency medical technician (EMT) stated that Salter's work area "stank" and "came into work holding his nose when he passed my desk." Salter Depo (Doc # 62, Exh A), at 276:4–7. Salter also stated that, on one occasion, a doctor said to her that he "couldn't understand how the New Guinea people were as

dark as" she was. *Id.* at 290:2–4. Salter has also put forward an incident in which another doctor allegedly made horse-like "neighing" sounds to a group of Caucasian nurses immediately after telling Salter that he liked her hair extensions. *Id.* at 299:3–8. Moreover, Salter contends that, on one occasion, when she brought her daughter to the ER for treatment, they were forced to wait 25 minutes before her daughter was registered, but that Caucasian employees' family members were always "taken right back." *Id.* at 297:8–298:4.

On August 13, 1999, Salter injured her neck at work while lifting a box of charts to compile an end-of-the-month report that had been requested by a supervisor. *Id.* at 240:13–20. Salter subsequently filed a worker's compensation claim and was off work for approximately two and a half months. *Id.* at 241:8–13.

After Salter's return to work, another unit clerk, Ann Hunter, brought a lawsuit against Washington Hospital in January, 2000, Case No C–00–0071–VRW, which was also assigned to the undersigned. See Salter Depo (Doc # 62, Exh A), at 54:15–56:20. At some point between January and April 2000, Salter was asked to testify on behalf of the hospital in the Hunter lawsuit. *Id.* at 55:11–20. Salter ultimately declined the hospital's invitation and alleges that shortly thereafter, as a result of her refusal, defendant retaliated against her by (1) transferring the only other African–American unit clerk to another area, thereby isolating Salter; (2) refusing to provide shift assistance or other relief so she could take her breaks; (3) requiring Salter to work in areas away from the clerk desk and (4) assigning additional work responsibilities including the compilation of a monthly statistical report, a task which required Salter to lift boxes of charts to complete the report even though defendant knew she had injured herself

performing that same activity in August 1999. *Id.* at 74:23–82:24.

On April 17, 2000, Salter filed an EEOC claim against defendant. Def Mem (Doc # 58) at 7. Eleven days later, Salter reinjured herself while lifting charts out of a box to prepare the end-of-the-month report and filed another worker's compensation claim. *Id.* Salter has not returned to work at Washington Hospital since April 28, 2000. *Id.* at 7–8.

II

In reviewing a summary judgment motion, the court must determine whether there are genuine disputed issues of material fact, resolving any doubt in favor of the party opposing the motion. The burden of establishing that there is no genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the nonmoving party would bear the burden of proof at trial, the moving party may meet its burden by pointing out—not by a conclusory statement but by demonstration—the absence of evidence to support the nonmoving party's case. Id. at 325–26, 106 S.Ct. 2548. When a motion for summary judgment is made and supported, the nonmoving party may not rest upon the mere allegations or denials of the nonmoving party's pleading, but the nonmoving party's response must set forth specific facts showing that there is a genuine issue for trial. FRCP 56(e). Summary judgment is granted only if the moving party is entitled to judgment as a matter of law. FRCP 56(c).

A

■ As a preliminary matter, the court considers each party's evidentiary objections. See Pl Obj (Doc # 70); Def Obj (Doc # 75). Salter objects to several pieces of evidence as "false and mislead-

ing", but whether a declaration, from the opposing party's view, misstates facts pertains to the weight and credibility to be afforded and is not a proper basis to exclude it from evidence. In the context of the instant motion, Salter has been afforded the opportunity to submit her own evidence to the contrary. Salter also makes several objections to based on the "best evidence rule," but that rule is applicable only to the contents of a writing. See FRE 1001–08. The portions of the declaration Salter finds objectionable, however, do not purport to describe the contents of a written document. Thus, these objections are OVERRULED as well.

■ Salter objects to the entirety of the declaration of Tommye Farley because it fails to disclose that she supervised Salter. But Farley states, in the very first paragraph of her declaration, that she "was the manager of the Emergency Department of Washington Hospital" during the time in question and, "in that capacity, [she] supervised the unit clerks * * *." Farley Decl (Doc # 60), ¶ 1. Furthermore, Farley states that "[b]y virtue of [her] employment at Washington Hospital, [her] position * * *, and [her] personal involvement in the facts and circumstances of this case," she could testify concerning the contents of her declaration based on her personal knowledge thereof. *Id.* Hence, Farley has laid a sufficient foundation for her declaration; Salter's objection thereto is OVERRULED.

In addition, Salter objects to portions of defendant's memorandum of points and authorities. Legal memoranda, however, do not constitute evidence; hence, they are not the proper subjects of evidentiary objections. See FRCP 56; Civil LR 7–5. These objections are OVERRULED.

■ Salter contends that the court may not consider the excerpts of the deposition transcripts attached to the declaration of one of defendant's attorneys, Jona-

than Martin, because he was not present at the deposition in question. "A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent." *Orr v. Bank of America,* 285 F.3d 764, 774 (9th Cir.2002). The deposition excerpts in question identifies both the names of deponent and the instant case, and includes the reporter's certification. See Martin Decl (Doc # 62), Exh A. Salter's objection is accordingly OVERRULED.

■ Salter also objects to attachments to the Martin declaration purporting to be exhibits used during Salter's deposition. See *id.,* Exh B. These attachments include a letter purportedly written by Salter and documents from Salter's EEOC claim. The accompanying declaration, however, merely asserts conclusorily that these attachments were exhibits used during Salter's deposition, for which declarant was not present. It does not supply any other basis for foundation or authentication. Because these attachments have not been properly authenticated, the court SUSTAINS this objection and does not consider these attachments. See *Orr,* 285 F.3d at 777–78.

Defendant also makes numerous objections to Salter's evidentiary submissions. See Def Obj (Doc # 75). The court, however, DENIES them as moot because even if the court admits the evidence in question, summary judgment in favor of defendant is nevertheless warranted.

Having addressed the parties' evidentiary objections, the court considers the merits of the instant motion.

## B

Salter alleges that she was subjected to a hostile work environment based on her race at Washington Hospital. Both FEHA and Title VII proscribe discrimination on the basis of race. Cal Govt Code § 12940(h)(1); 42 USC 2000e. Because the provisions of FEHA at issue here have been found to be substantively identical to Title VII's, the court need only consider the merits of Salter's claim under Title VII. *Brooks v. City of San Mateo*, 229 F.3d 917, 923 n. 3 (9th Cir.2000); *Beyda v. City of Los Angeles*, 65 Cal.App.4th 511, 76 Cal.Rptr.2d 547, 550 (1998).

■■■ To bring a claim based on a hostile work environment, "plaintiff must show: (1) that [she] was subjected to verbal or physical conduct of a racial nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir.1998). The working environment must be perceived as abusive both subjectively and objectively. *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir.1995). "A hostile work environment claim involves a workplace atmosphere so discriminatory and abusive that it unreasonably interferes with the job performance of those harassed." *Brooks*, 229 F.3d at 923.

■■■ Workplace conduct is not measured in isolation; whether an environment is sufficiently hostile or abusive to support a claim is determined by examining all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, whether it is more than a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). The

Supreme Court has repeatedly emphasized that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citation and quotation marks omitted).

### 1

Defendant argues that the alleged incidents put forth by Salter are neither hostile nor racial. Defendant contends that only the ER doctor's remark concerning Salter's skin tone can reasonably be characterized as "racial in nature," and even that remark in no way suggested racial animus. Def Mem (Doc # 58) at 7, 11. Other incidents of harassment, such as the comment that her work area "stank," according to defendant, are simply are not racial in nature. *Id.* at 10.

■■■ A discriminatory work environment, however, may be created if sufficiently hostile actions are directed at members of a targeted race even if the actions themselves are not racial on their face. See, e g, *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir.1971) ("As patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees."). Simply because a remark on its face does not reference race does not necessarily signify that the action is not racially motivated or directed.

### 2

■■■ Defendant also argues that the conduct put forward by Salter simply fails to rise to the level of severity or pervasiveness required to support a finding of a

hostile work environment. Def Mem (Doc # 58) at 12–14. Defendant points to cases with facts in which the conduct in question was far more severe and pervasive than the allegations involved here, but in which the conduct at issue was not severe or pervasive enough to establish a hostile work environment. Def Mem (Doc # 58) at 13; see, e g, *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir.1994) (no hostile work environment in which African–American plaintiff was assigned to a disfavored warehouse and was subjected to at least twenty incidents of harassment by co-workers over an 18–month period, including statements that "you had better be careful because we know people in [the] Ku Klux Klan," repeated references to the term "nigger," and insults in the form of various vulgar epithets).

Recently, in *Vasquez v. County of Los Angeles*, 307 F.3d 884, 893–4 (9th Cir. 2002), the Ninth Circuit affirmed summary judgment in favor of defendant because the plaintiff's allegations were insufficient as a matter of law to support a claim of hostile work environment. In particular, the plaintiff's claim was based primarily on a few incidents over the course of more than one year. See *id.* at 893 (statements by more senior coworker that plaintiff had "a typical Hispanic macho attitude" and that he should consider transferring to the field because "Hispanics do good in the field; yelling at plaintiff for not following directions; only two specific allegations of false complaints about plaintiff to supervisor over the course of one year"). The Ninth Circuit explained:

> When compared to other hostile work environment cases, the events in this case are not severe or pervasive enough to violate Title VII. In *Sanchez v. City of Santa Ana,* the court dismissed plaintiff's hostile work environment claim. We held that no reasonable jury could have found a hostile work environment despite allegations that the employer

posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino.

307 F.3d 884 at 893 (internal citations omitted). The *Vasquez* court reasoned that because "[t]he allegations in *Sanchez* were at least as severe as those in this case," summary judgment was appropriate. *Id.* Likewise, the court here concludes that Salter's allegations of only a few isolated and insufficiently severe remarks and incidents are simply insufficient to state a hostile work environment claim. Hence, defendant has pointed to an absence of genuine issue concerning Salter's hostile work environment claim.

Salter attempts to rescue herself from summary judgment by submitting a vague and conclusory declaration which contends that these incidents occurred repeatedly and were therefore pervasive. See Salter Decl (Doc # 68). But, as described below, her declaration directly contradicts her deposition testimony.

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir.1991) (citations omitted). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir.1975) (citation omitted).

At her deposition, Salter testified that there was a single incident in which an EMT remarked that her work area

"stank" and walked by holding his nose and a single incident in which a doctor asked her about her skin tone. See Salter Depo (Doc # 62, Exh A), at 276:4–7, 289:11–290:22. Salter testified that the EMT did not tease any "other black" about a smell. Salter Depo (Doc # 69, Exh 13), at 281:18–19. By contrast, in the declaration submitted in connection with defendant's pending summary judgment motion, however, Salter asserts in a conclusory fashion that "the taunting and harassing about the way we naturally smelled occurred anytime the EMT came on the floor, sometimes eight to nine times a day, nearly every day, for over one year." Salter Decl (Doc # 68), ¶ 7.

Additionally, Salter testified at her deposition that, as early as June 1999, she had been moving boxes and asked to work in locations other than the clerk's unit. Salter Depo (Doc # 62, Exh A) at 90:23–25, 92:16–23. Salter also testified that her first injury in August 1999 resulted from lifting and moving a box to obtain information for the end-of-the-month report. *Id.* at 74:23–82:24. In connection with summary judgment, however, Salter states in her declaration that she was first required to move boxes and work in other areas as retaliation *after* refusing to testify in the Hunter lawsuit in 2000. Salter Decl (Doc # 68), ¶ 17.

The court finds these portions of Salter's declaration to be a sham and therefore disregards her declaration to the extent it directly contradicts her deposition testimony and represents a transparent attempt to create a triable issue. See *Kennedy,* 952 F.2d at 266–267.

Even if the court were to accept these assertions contained in her declaration as true, Salter nonetheless fails to meet her burden to survive summary judgment. Salter claims that she was "continually harassed but * * * provides specific factual allegations regarding only a few in-

cidents." *Vasquez,* 307 F.3d at 893 (disregarding for purposes of summary judgment general allegations otherwise unsupported by specific factual contentions). In her opposition, Salter states that "said events happened on a consistent and nearly daily basis for nearly one year" but does not identify which occurrences constitute the "said events." Pl Opp Mem (Doc # 66) at 8. Salter does not mention any specific incidents in her declaration other than the few incidents detailed in her deposition testimony. Salter has only provided her conclusory assertions as evidence that these incidents occurred "because she was Black." Pl Opp Mem (Doc # 66) at 8. Although Salter contends that "racial comments and sexist jokes" were made about her, Salter Decl (Doc # 68), ¶ 2, she fails to set forth specific facts of these allegations as required by FRCP 56(e) and by the Ninth Circuit in *Vasquez.*

Additionally, the work atmosphere alleged by plaintiff is less severe than the work atmosphere alleged in *Vasquez.* Salter has presented no evidence that the alleged comments about the scent around the clerk desk, the "New Guinea" comment, the hair extensions incident, or waiting 25 minutes in the ER were hostile and rose to the level of "a workplace atmosphere so discriminatory and abusive that it unreasonably interfere[d] with the job performance of those harassed." *Brooks,* 229 F.3d at 923. There is no evidence that the juvenile antics of coworkers, the "New Guinea" comment or the hair extensions incident were ever anything but "simple teasing," and it is clear that these irritations, over the course of her employment, were not objectively severe enough to constitute "discriminatory changes in the terms and conditions of employment." *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (citation and quotation marks omitted).

Indeed, even though Salter complains that she and her daughter were forced, on one occasion, to wait 25 minutes in the ER before her daughter could register, Salter testified that her treatment was otherwise entirely satisfactory. Salter Depo (Doc # 62, Exh A) at 297:17–19. The totality of these minor incidents simply does not rise to the level of severity or pervasiveness required to establish a hostile work environment.

 Nor could alleged actions by co-workers to "isolat[e]" her support a hostile work environment claim. Salter Decl (Doc # 68) at ¶ 2, ¶ 9. An employer cannot force employees to socialize with each other. *Brooks,* 229 F.3d at 929. Holding an employer liable because its employees refuse to associate with each other "might well be unconstitutional: 'The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate.'" *Id.* (citations omitted).

Salter has failed to set forth specific facts showing that Washington Hospital was an objectively racially abusive workplace environment as required by FRCP 56(e). Plaintiff has also not met the requirements for a hostile work environment claim: under *Vasquez,* she has failed to show as a matter of law that the conduct rose to the level of severity required by Title VII.

Summary judgment with respect to both of plaintiff's claims for discrimination is therefore GRANTED.

## C

 Salter also alleges that her employment with defendant was constructively terminated. In order to survive summary judgment on her constructive discharge claim, Salter must show a triable issue of fact "whether a reasonable person in her position would have felt that she was forced to quit because of intolerable and discriminatory working conditions." *Bergene v. Salt River Project Agric. Improvement & Power Dist.,* 272 F.3d 1136, 1143–44 (9th Cir.2001) (citations and quotation marks omitted).

The sole function of the doctrine of constructive termination is to allow an employee to pursue a cause of action for wrongful termination subsequent to the employee's resignation from an intolerable work environment: constructive termination is a doctrine that transforms a resignation into a discharge. *Turner v. Anheuser–Busch, Inc.,* 7 Cal.4th 1238, 32 Cal. Rptr.2d 223, 231, 876 P.2d 1022 (1994).

 To establish constructive termination, an employee must prove that due to discrimination, the working conditions have become "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and serve his or her employer." *Id.* at 223. "Where a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job." *Brooks,* 229 F.3d at 930. Because Salter has failed to meet the standard for her hostile work environment claim, Salter's constructive termination claim also fails as a matter of law.

Accordingly, summary judgment on Salter's third cause of action for constructive termination is GRANTED.

## D

Salter also alleges retaliation under Title VII and FEHA. Salter claims defendant retaliated against her on two separate occasions: (1) her refusal to testify on behalf

of defendant in the Hunter lawsuit, which occurred in early 2000, and (2) her decision to sign a declaration on behalf of plaintiff in the Hunter lawsuit in July 2001.

 To establish a prima facie case of retaliation, a plaintiff must show that: (1) plaintiff engaged in a statutorily protected activity; (2) the employer subjected plaintiff to an adverse employment action; and (3) a causal link exists between the protected activity and the employer's action. *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 506 (9th Cir.2000); *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984). If the plaintiff makes out a prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-retaliatory reason for the adverse action." *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir.1982). If the defendant succeeds, the burden then shifts back to the plaintiff to show that the asserted reason is pretextual. *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987).

### 1

 The parties dispute whether Salter's refusal to testify on behalf of the hospital in the Hunter lawsuit was a statutorily protected activity. The court, however, need not resolve this issue because Salter has failed to establish either an adverse employment action or a causal link.

Salter claims that defendant retaliated against her refusal to testify in the Hunter lawsuit by (1) transferring the only other African–American unit clerk away from Salter's work area, (2) refusing to provide assistance or relief so Salter could take her breaks, (3) requiring her to compile the end-of-the-month reports, which required lifting and moving heavy boxes, and (4) forcing her to work in areas away from the clerk desk. Salter Depo (Doc # 62, Exh A) at 74:23–82:24.

 The transfer of the only other unit clerk does not constitute an adverse employment action. As the Ninth Circuit recently explained, "the proper inquiry is to view the action objectively to determine whether it was adverse." *Vasquez*, 307 F.3d at 891. As in that case, Salter's preference to have a particular coworker work nearby "was purely subjective" and has offered "no evidence" that transfer of that coworker to another work area was "objectively less desirable or disadvantageous." *Id.* This objective standard is necessary because "[o]therwise, every minor employment action that an employee did not like could become the basis of a discrimination suit." *Id.* Moreover, Salter even admitted at her deposition that she was the "only unit clerk, period, on the shift". Salter Depo (Doc # 62, Exh A), at 234:20–25. No reasonable fact-finder could conclude that the transfer of a co-worker who did not work the same shift as plaintiff constituted an adverse employment action.

The remaining alleged incidents of retaliation fail because Salter cannot establish a causal link. Salter had been required to compile, as part of her job, the end-of-the-month reports, which required her to lift and carry heavy boxes, starting as late as June 1999, well before her decision not to testify in early 2000. See Salter Depo (Doc # 62, Exh A), at 84:23–85:16, 90:23–92:18. In addition, Salter had complained of defendant's failure to provide adequate shift relief as late as June 10, 1999, when she wrote a letter to her supervisors complaining of the lack of shift relief. See Salter Depo (Doc # 62, Exh A), at 222:5–223:2, 223:18–224:6, 225:25–226:24, 223:8–16. These allegedly retaliatory acts occurred more than six months prior to her decision not to testify on behalf of the hospital. Nor does Salter contend that the severity of defendant's conduct worsened or materially changed after she declined

the hospital's invitation to testify. Accordingly, the acts alleged by Salter could not have been in retaliation for her decision not to testify.

### 2

■ Salter also contends that defendant retaliated against her in July 2001, after she signed a declaration on behalf of the plaintiff in the Hunter lawsuit. At the time, Salter had already left work because of her back injury and had not returned. Salter claims that defendant retaliated against her by refusing to provide another position that satisfied her medical restrictions.

The parties do not dispute that her decision to participate on behalf of Hunter in her lawsuit is a protected activity. Again, however, Salter's retaliation claim fails because the timing and sequence of events preclude finding the existence of a causal link. Salter claims that she signed her declaration on behalf of Hunter on July 5, 2001. See Salter Decl (Doc # 68), ¶ 24. But the letter from Tristar Claims Administration, the company handling her worker's compensation case on behalf of defendant, is dated July 2, 2001, and simply states: "Your employer does not have a job available within your work restrictions." Id., Exh 6, at 10.

■ A causal connection may be established "by showing that the employer knew of the employee's protected activity and the adverse personnel action took place shortly after that activity." Sisay v. Greyhound Lines, Inc., 34 F.Supp.2d 59, 65 (D.D.C.1998) (citing McKenna, 729 F.2d at 790). But here, the determination that no appropriate jobs were available was made before the date Salter signed her declaration. Salter does not suggest or provide any evidence that defendant knew of her intent to participate in the Hunter lawsuit beforehand.

Notwithstanding the undisputed date of the letter Salter supplies, Salter attempts to create a genuine issue by arguing, in her opposition memorandum, that defendant made its determination on July 13, 2001, instead of, at the very latest, July 2, 2001. But the portion of the record she cites to support this proposition does not provide any support whatsoever. In addition, Salter cites to "Exhibit 13" of her declaration, but the exhibits attached to the declaration are numbered 1 through 7; there is no Exhibit 13 to Salter's declaration, nor is one referenced by the declaration itself. Upon its own review of the record, the court also is unable to find any evidence to create a genuine issue that the determination that no medically appropriate jobs were available was made after July 5, 2001. Accordingly, there is no genuine dispute that the allegedly retaliatory act in question occurred after defendant learned of her protected activity.

### E

As the court has granted defendant's motion for summary judgment on all of Salter's claims, defendant's motion for partial summary adjudication concerning its status as a public entity for purposes of determination of punitive damages is DENIED as moot.

### III

In conclusion, the court GRANTS defendant's motion for summary judgment and DENIES as moot defendant's motion for partial summary adjudication concerning Washington Hospital's public entity status (Doc # 58). The clerk is directed to close the file and terminate all pending motions.

IT IS SO ORDERED.